STATE OF CONNECTICUT :

: NO.: 18MJ 831 (DFM)

COUNTY OF HARTFORD : May 31, 2018

**AFFIDAVIT**

I, Adam Schepis, a Special Agent of the Federal Bureau of Investigation, New Haven Division, having been duly sworn, do hereby state:

## I. INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United Sates Code. I have been employed as a Special Agent with the FBI since 2016. Prior to my employment with the FBI, I was employed as a Detective with the Boone County (KY) Sheriff's Office Bureau of Criminal Investigations from 2008-2016.

2. I have received basic narcotics investigation training from the Department of Criminal Justice Training in Richmond, Kentucky and at the FBI Academy in Quantico, Virginia. I have attended FBI-sponsored training focusing on the use of informants and cooperating witnesses. I have also attended additional gang and narcotics trainings sponsored by Federal, State, and Local Law Enforcement. During my eight years in law enforcement, I have participated in numerous investigations involving the illegal distribution of controlled substances. My duties in prior investigations included the coordination of controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses, coordination of the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, illegal firearms, and

acts of violence, to include homicide. I have also conducted electronic and physical surveillance of individuals involved in illegal drug distribution and analyzed records documenting the purchase and sale of illegal drugs. I have also interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state, and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have written and executed search warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations. I have previously served as a co-case agent and administrative agent on a Title III investigations and have participated in other Title III investigations.

3. I submit this affidavit in support of a search warrant for an Alcatel One Touch flip phone, Model A392A, bearing IMEI number 014077003930650 ("**Target Device**"), which is currently in possession of the Hartford Police Department, 253 High Street, Hartford, CT.

4. As this affidavit is being submitted for the limited purpose of obtaining a search warrants for the **Target Device**, I had not included all the facts and information obtained during this investigation. Rather, I have included only those facts, which I believe provide probable cause to conduct the requested search.

5. From my experience and training, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. Based upon my training and experience, I know that drug traffickers frequently have access to several wireless telephones, and that they periodically use newly acquired wireless telephones. I also know that narcotics traffickers frequently use wireless telephones subscribed to other persons and pre-paid wireless

telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

6. I know, based upon my training and experience, that drug dealers sometimes segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one phone to communicate with customers and another to communicate with their source of supply (hereafter "SOS"). In addition, drug dealers often use different phones to deal with different "lines" of customers. For example, a drug dealer may use one phone to communicate with customers who regularly purchase small, pre-packaged quantities of narcotics and another phone for customers who regularly purchase larger quantities, or may use different phones to distribute different types of narcotics. Similarly, drug dealers whose business extends into multiple states, also sometimes use one phone for local customers and another phone for out-of-state customers. Finally, notwithstanding the foregoing, I know that drug dealers often utilize two or more wireless telephones interchangeably for all their narcotics trafficking undertakings. This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more phones interchangeably also enables distributors to immediately terminate service on one phone – if they believe the phone is being targeted by law enforcement for installation of a court-authorized wiretap – without crippling their illegal business.

## II. PROBABLE CAUSE

7. On December 18, 2017, a Hartford Police confidential informant (CI), acting at the direction of law enforcement investigators, called LEGGETT to arrange a narcotics deal.

LEGGETT told the CI to meet him at Garden and Bedford Streets in Hartford. The CI was followed to 304 Garden Street where surveillance officers watched the CI enter 304 Garden Street. About one minute later, the CI exited the building, returned to his/her vehicle and drove to meet investigators. The CI turned over a quantity of crack cocaine s/he purchased from LEGGETT.

8. Soon after, investigators observed LEGGETT exit the building and enter the front passenger seat of a Ford Edge.[1] Investigators followed the vehicle onto Albany Avenue. Investigators in an unmarked vehicle pulled alongside the Ford Edge and observed that LEGGETT was now seated in the rear seat, and the front passenger seat was unoccupied. When the vehicle reached Ann Street, the Ford Edge was stopped, and multiple officers converged on the vehicle. LEGGETT was seen frantically moving his hand near the pouch on the front passenger seat. LEGGETT was ordered to show his hands, which he did, and was removed from the car.

9. Protruding from the front seat pouch, where LEGGETT was seated, was a plastic bag with several blue wax sleeves which investigators recognized as heroin packaging. When the pouch was pulled open, a black firearm was also observed inside the pouch. United States currency was also observed scattered around the rear passenger area. The suspected heroin and gun were photographed and then removed from the seat pouch. The suspected heroin (148 bags) was subjected to a field test and tested positive for the presence of heroin/fentanyl. The firearm, a Ruger 9 mm pistol, was loaded with 14 rounds of ammunition. The currency was collected and totaled $655. LEGGETT stated that the money was his. A search of LEGGETT's person resulted in the recovery of approximately four grams of suspected crack cocaine, packaged in two separate clear knotted pieces of plastic, a digital scale and the **Target Device**.

---

[1] Investigators knew that there was also an active Hartford Police arrest warrant for LEGGETT charging him with attempted first degree assault with a firearm, criminal possession of a weapon, and risk if injury to a minor.

10. After LEGGETT was arrested, and the **Target Device** seized, one of the investigators called the number used by the CI during the drug buy from LEGGETT, and the **Target Device** rang confirming that the **Target Device** is the phone used by LEGGETT in furtherance of his drug trafficking activity.

11. From my training, experience, and participation in other narcotics investigations, I know that narcotics traffickers commonly use one, or more, wireless telephones or devices when conducting their illicit transactions, especially when there are multiple people conspiring to conduct the transaction. I know from the investigation that the CI communicated with LEGGETT by phone to arrange the drug purchase on December 18, 2017, and that in my training and experience, street level narcotics dealers such as LEGGETT rely on wireless phones to conduct their illicit narcotics business.

## III. TECHNICAL TERMS

12. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing electronic communications such as text messages and email; taking, sending, receiving, and storing photographs and video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device

b. Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable media to store

recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System ("GPS") to display its current location. It often contains records of the locations where it has been and addresses and directions to locations programmed by the user. The Global Positioning System consists of 24 NAVSTAR satellites orbiting Earth. Each satellite contains a precise clock and repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculates the antenna's latitude, longitude, and sometimes altitude, with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13. Based on my training, experience, I know that wireless telephones have different capabilities (some possessing more than one) that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, a hand-held radio, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence relating to co-conspirators with whom the **Target Device** was in contact.

14. With regard to the **Target Device**, I request permission to enter and search the devices for evidence relating to the unlawful distribution, and the possession with intent to distribute, narcotics, including evidence of communications between and among LEGGETT and and other co-conspirators involved in the possession and distribution of narcotics. Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to distribute narcotics and it is likely that the **Target Device** was used by LEGGETT in the unlawful possession and distribution of narcotics. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of email communications between co-conspirators who distribute narcotics, or conspire to do so. Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with the unlawful distribution of narcotics such as the businesses used for shipping and receiving contraband, renting or leasing vehicles to transport narcotics, and storing illegal narcotics such as commercial storage facilities. Also based on my training and experience, wireless phones may contain videos and images of coconspirators, possible locations to ship, receive, or store narcotics, as well as images of the quantity of narcotics and/or shipping packages within which the narcotics are concealed. I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations ship, receive, or store narcotics, as well as locations of meetings involving co-conspirators. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the importation and distribution of narcotics:

f. the telephone number, ESN number, serial number, and SIM card number of said phones;

g. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said devices;

h. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

i. any and all records, however created or stored, which tend to demonstrate ownership and use of the phones, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phones;

j. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phones, such as passwords, sign-on codes, and program design;

k. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

l. saved searches, locations, and route history in the memory of said devices;

m. internet browsing history, to include, internet searches in the memory of said device; and

n. Images and videos in the memory of said device.

15. It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often

necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

16. It is also requested that the warrant be deemed executed once the **Target Device** has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## IV. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

18. As described above and in Attachment A, this application seeks permission to search and seize things that the **Target Device** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

19. Searching for the evidence described in Attachment A may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with

appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## V. CONCLUSION

20. I submit that this affidavit supports probable cause for a warrant to search the **Target Device** and seize the items described in Attachment A as evidence, fruits, and instrumentalities of the crimes of conspiracy and attempt to possess with intent to distribute heroin, in violation of Title 21, United States Code, Sections 841 and 846.

ADAM SCHEPIS
Special Agent, FBI

Sworn to and subscribed before me on this the 31st day of May, 2018.

/s/ DFM

, USMJ

DONNA F. MARTINEZ
United States Magistrate Judge